Okay, the next case is number 131619 in Re Louisiana Fish Fry Products. Mr. Ford, you're ready. Thank you, Your Honor. May it please the court, my name is Bennett Ford. I'm here on behalf of Louisiana Fish Fry Products, the appellant and applicant in this case. We're here today because the Trademark Trial and Appeal Board has taken the fateful step of tossing a large portion of my client's trademark into the public domain by declaring it to be generic. And also because the board failed to apply the proper standard in assessing acquired distinctiveness. They say it was already in the public domain. Isn't that your problem? Well, that's what they say, Your Honor, but they have the burden of proving that and our position is that first, they did not apply the proper legal standard in determining genericness. And second, the evidence that's actually in the record does not meet the board's burden of proof of establishing genericness by clear and convincing evidence. The legal standards, the legal error in the standard is twofold. The board did two things. First of all, it applied Gould. And this court has repeatedly held that Gould is only applicable to compound terms. The market issue is not a compound term. Fish Fry Products is not a compound term. The mark in Gould was screen wipes. Why is it not a compound term? Because it's not a single word? Yes, sir. Had there been no spaces, then that would have been a compound term? That is the distinction this court has made repeatedly in American Fertility and Dial-A-Mattress. Gould applies to compound terms. We're familiar with them. This is not a concept of law that's unique to trademark law. Compound terms are ordinary inks, duck, doghouse, Superman, carport, terms that are multiple words joined together. And this court has repeatedly said Gould is only applicable to such compound terms. It is not applicable to phrases like Society for Reproductive Medicine, Fish Fry Products. The application of Gould was legal error. The second legal error was in the board's attempt to apply standard for genericness. It's been the law in this court since at least 1986 when Marvin Ginn was decided. The Ginn test is straightforward. First, you have to assess, the board has to assess what the proper genus is for the goods in the application. And second, the board has to establish that the phrase at issue, that it's of primary use or primary understanding is in reference to the genus that they assessed in the first half of the test. It's a two-part test. Here, the board properly determined the genus. Everyone agrees to that. The genus is spices, sauces and marinades. And the board properly decided that. And then it jettisoned that determination when it moved to the second half of the analysis. Instead of deciding whether the public primary understanding of fish fry products was in reference to spices, sauces and marinades, it attempted to determine whether the primary understanding of the public was in reference to spices, sauces and marinades used in connection with fried fish. So it took the genus, the properly determined genus, and attempted to assess genericness based upon some much more narrow genus. And that is directly contradictory to the holding in steel buildings. And I think it's worthwhile to revisit the facts in steel buildings. There, the applicant was offering, the board determined that the genus was retail sales of metal buildings. And this court decided that was improper, because it did not take into account the full scope of the applicant's services. Because in addition to just retail sales, the applicant in steel buildings also provided custom design of metal buildings. And this court said that alone is enough to Well, the board here wants to make that first aspect, the determination of the proper genus, an academic exercise. It wants to say, well you determined the genus and then you don't have to use that. And if you think about it, that completely vitiates the holding of steel buildings. I mean, the trademark office could go back and say, okay, we've determined the genus, we've done it properly and then we can ignore it and use the narrow genus we started out with that this court corrected us So, taking the genus and narrowing it down to something smaller than what the accurate genus they have to determine, that completely undermines steel buildings and is improper. And I think it's important to realize what that does to the trademark analysis if the board can that in any case. I mean, you can take almost any mark and turn it into a generic mark if you're allowed to do this. Across the panoply of trademarks, only the most arbitrary or fanciful marks lack a connection to the goods and services. The example we used in our brief was a Ranger. Ranger is not generic for the genus of pickup trucks. But isn't marinade, sauces, or spices for fried fish just a type or a subset of marinades, sauces, or spices in general? It's a much narrower subset. I mean, it is a subset. And the question is, do you... Why is it not enough then to find generic this? Well, I think the answer to that is twofold. First, if you don't have to find that it's generic for the entire genus, for only a subset of the genus, if that's what the test is, then you're throwing steel buildings out. You've said steel buildings is an academic exercise. That's the first reason. Second, and this was the point I was trying to make about the different marks. You can do this and turn anything into a genericness. It completely... Turn any mark into a generic mark. It completely gives the trademark board the discretion to essentially decide genericness without having to prove it. And I think the example that we provided in our brief illustrates this. Ranger is not generic for pickup trucks. But Ranger trucks are sold to lots of different people who are rangers. They're forest rangers, Texas rangers, army rangers. And if the board can say, we're going to pick this subset and narrow down the genus from trucks to trucks sold to rangers, then Ranger becomes generic for this narrow class. Same thing with buck knives. Buck is not generic for knives. But these knives are sold to hunters. And if you can take buck knives and narrow the genus down to knives used to clean deer, then buck becomes generic for knives. Let's talk about this mark. How long has Louisiana been using this mark? They began using the mark in 1985. Was there evidence in the trademark office of significant evidence of acquired distinctiveness? And if I may, I'd like to address the absence of evidence of third party use and the acquired distinctiveness. Isn't the burden on the applicant to demonstrate? The burden is on the applicant to demonstrate secondary meaning. The absence of any third party using this phrase, despite the fact that we have been using it since 1985, is a really significant issue on the genericness question. Because our third issue on genericness, besides the question of law, Your Honor, is that the board has not met its burden of proof with regard to genericness. This court quoted trademark judge Hammond in American Fertility. And he tells us that the only time the trademark office can meet its burden of proving the understanding, the primary understanding of a mark, when there's no evidence in the record of third parties using the mark. Are you saying there's a presumption of distinctiveness for any words? No, ma'am. I'm not. Then why do they have such a burden? Because this court has established that the trademark office has the burden of establishing genericness. Is there any evidence that your client has used the term fish fry products alone for purposes of distinctiveness? My client has not used the phrase fish fry products alone. But our position is that with regard to acquired distinctiveness, the board erred below in requiring evidence of its use alone. And the reason that is an error is because the board did not require it in Kellogg. That's a precedential decision on the board. And in Kellogg, you've got cinnamon toast crunch. If we find that Kellogg is distinguishable, do you have a problem on distinctiveness? I have. Well, I guess it depends on what you... Let me just say, I mean, I think fish fry products sounds pretty descriptive. And so in order to get over that, you have to show it's acquired some kind of distinctiveness. And it doesn't seem to me that there's any evidence that you've used fish fry products alone to establish a secondary meaning. It's always been in combination with Louisiana or a bunch of other marks and things like that. So I wonder if we find then are obliged to uphold the board on distinctiveness. I think that with regard to acquired distinctiveness, I'm not asking this court to reverse the board. I am asking this court to return the decision to the board to reassess the acquired distinctiveness under the proper legal standard. And that is... On distinctiveness, does that get rid of this case? It doesn't. It doesn't. And I'm glad you asked that. If the only issue here were acquired distinctiveness, we wouldn't leave. I mean, I can go back and acquire distinctiveness and establish additional evidence later. I can keep using the mark. The problem is not that the board decided acquired distinctiveness. The problem is the board determined that the mark is generic. That's the entire mark. There was no problem, was there, with Louisiana fish fry products with the disclaimer? That's true. Doesn't that solve any problem that your client might encounter in terms of copiers or free riders or anything else? They can't use fish fry products with Louisiana. Isn't that correct? If we disclaimed it, I agree with that. But my client's position is it's been using fish fry products for 30 years. But it hasn't been using fish fry products for 30 years. It's been using Louisiana fish fry products for 30 years. Well, I think that's the factual dispute. I mean, the dispute is... There's no real dispute, is there? You haven't cited a single instance where you used fish fry products alone. I agree with that. I'm not disputing that. The issue is whether our long use of Louisiana fish fry products has established secondary meaning in fish fry products. But the evidence you submitted to support that was sales evidence, invoices, sales reports, and things of that nature. But that all included Louisiana fish fry products and not just fish fry products. That's correct. We don't challenge that. And the opposite... Sorry, I'm in... No, go ahead. It's fine. Ricky, you can ask the other side. All right, thank you. We'll save you rebuttal time, Mr. Lloyd. Mr. Casagrande. Could you address that last point first, that if we agree with the office that it's descriptive and hasn't required distinctiveness, that it would still require a remand if we agree with him on genericness? No, I think that if that were to happen, the case is over and this particular mark is refused because they did not enter the disclaimer that was requested by the trademark examining attorney. Either one of these grounds would be a sufficient basis to uphold what the board did here. Is there anything in the future that if they did use fish fry products alone and try to acquire distinctiveness, that would prevent them from coming back to the board because of this case? No. Section 2F and the acquired distinctiveness requirement is something that is basically bounded by the evidence at a particular time. So if at some time in the future they were to come in with appropriate evidence that showed that fish fry products had, in fact, acquired distinctiveness in the minds of consumers, they would be permitted to try to get that registration without the disclaimer. How do you answer your opponent's argument that you applied a different standard than precedent with respect to distinctiveness? I believe that's a reference to the Kellogg case, Your Honor. And we think that Kellogg is an apposite for a number of reasons. Number one, that was a case in which it was an inter partes dispute. And in an inter partes dispute, the challenger has to come up with, it has the burden of proof to show a lack of acquired distinctiveness. In an ex parte prosecution matter like this one, it's the applicant's burden to show acquired distinctiveness. Second of all, the facts in the Kellogg case are not inconsistent with the facts here. In Kellogg, you had a case in which there was more dollars being spent on advertising, much higher sales. And so Kellogg was consistent with what the board here. And I think in our brief what we did, we pointed out that, for example, in the Boston beer case that this court decided over 10 years ago, there was even more sales and advertising than Louisiana fish fry products had in this case. In that case, that mark was still held to not have acquired distinctiveness. So this case is consistent with both Kellogg and with Boston Beer Company. And each case has to be decided on its own facts. And we think there's substantial evidence in the record here that shows that this case was decided correctly. I'd like to, if I could, get back to the genericness part of this. We think that this case, when you reduce it to the simple strokes, this case is about a broad product category and whether that can be registered as a trademark for goods that the applicant admitted it specifically markets as being within that broad product category. Is the position of the office that genericness must be established and affirmed in order for this rejection to stand? Or are you satisfied with the acquired distinctiveness ground? Either ground would be the basis to uphold what the board did here. They're in the alternative. We believe it's both generic and blacks acquired distinctiveness, however. And so unacquired distinctiveness for another 30 years is an opportunity, perhaps, to show secondary meaning. Yes, that's the nature of acquired distinctiveness, Your Honor. It's something that can grow over time. And if you show that evidence that it has grown over time at some point, it may reach that point where it becomes something that consumers understand as representing a source rather than describing a product. What I'd like to do on genericness is simply say there really are very few disputes here. There's no dispute that fish fry products means products used in preparing for eating fried fish. That's the meaning. There's no dispute about that. About consumer understanding of what those terms mean, there's substantial evidence in the record that shows public uses of the specific products that are listed in the application. Tartar sauce, cocktail sauce, remoulade dressing, in recipes calling for fried fish, in food articles talking about fried fish. These are things that are used directly on fried fish when you're either making it or eating it. And the applicant specifically confirmed when he was asked by the trademark examining attorney that these particular products are marketed by the applicant as something that can be used with fried fish. So these are fish fry products and the public understands them as such. But I think you define the relevant public as consumers who eat fried fish. That's correct. That's correct, Your Honor. And that essentially is consistent with what this case and the Remington products case. You have to look at the relevant public who does or may purchase the goods in the marketplace. And the goods here are cocktail sauce, tartar sauce, and remoulade. And the relevant public, the substantial evidence in the record shows that these are associated with fried fish. But under Magic Wand, wouldn't the relevant public be I would disagree with that, Your Honor. And it's maybe a small disagreement. What I think Your Honor's question does is links it to sort of a broader category that was used in the genus description here. But Magic Wand says you look at who the public is by looking at the specific goods in the application. And if you look at the specific goods in the application here, tartar sauce, cocktail sauce, remoulade, these are things that are inter-related to fried fish. And there's substantial evidence that shows that. So, we think that that's an entirely appropriate way to look at it. I would point out that when they made a bit of an argument about how the board narrowed the genus, I don't believe that the board did that. I think if you look at the board's opinion, they found what the genus was. And then they applied Magic Wand and said, okay, now we have to look at consumer understanding the relevant public for the particular goods and what the particular phrase means to them in the context of the goods. And what they were simply saying was that a consumer faced with tartar sauce, cocktail sauce, remoulade is going to understand that fish fry products isn't a brand but refers to those particular products. That's their primary understanding. And there was a lot of discussion. I would also make the point that even if you were to... Does the evidence of the record point to the definition of relevant consumer being those who eat, ordinary consumers that eat fried fish? That's the problem I'm having. I don't see that you have evidence that shows that. Or supports that, rather. Well, it's not... I think there needs to be evidence that shows that that's the particular market. We're instructed to look at what consumers of those particular goods are. And that's the understanding that we're looking for. And that's, I think, what the nub of Magic Wand is. You look at the consumer and you look at the consumer that is basically defined by what the applicant has defined as his goods. I would also point out that even if you were to accept the argument that the genus was narrow when the board continued on with its analysis, the applicant specifically admitted that it markets its goods at people to use with fried fish. So it's really kind of a distinction without a difference. If they're claiming that the genus was too narrow, it doesn't really matter if that's in fact what they're marketing their goods to do, is to be used with fried fish. I'd like to spend a minute talking about the Gould and American Fertility argument. Let me interrupt you and take you back to this case. On their request for a registration of Louisiana fish fry products without a disclaimer, and so the board has required a disclaimer, let's say that someone comes on the market with New Hampshire fish fry products. Would the presence or absence of a disclaimer in this opportunity to complain about New Hampshire fish fry products? It would. Why? It would because... It's still a unitary mark. They haven't asked to register fish fry products unrelated to Louisiana. It wouldn't be a per se prohibition against them going after someone like that if the person who was behind New Hampshire fish fry products would be able to come back and say, you can't, when you're looking at the mark, when you look at a mark, you look at the whole mark, but you also look at the components of it as well. And the New Hampshire fish fry products would be able to come back and say, to the extent that you're saying we can't use fish fry products, that can't be the basis of the likelihood of confusion that you're accusing us of. But why would that argument be any different with or without the disclaimer that has been required? The disclaimer would lend additional credibility to that kind of argument. Never mind credibility, let's talk about the law. Because when you're disclaiming it, you're saying essentially, I'm not claiming exclusive rights in that phrase alone. They haven't sought to register that phrase alone. Correct, correct. And the district court looking at an infringement case would in fact look at the entire mark in that situation. But I think there would also be, in looking at an entire mark that's comprised of several components, you also usually look at what the components are as well. And to that extent, I think the district court would be interested in whether there was a disclaimer of those three words. I just think it's an additional point of evidence on the spectrum. It's not an absolute prohibition. I don't know of any law that draws that distinction, do you? Well, this court has been clear, and lots of the other circuits have been clear, that when you look at a mark that's comprised of several components, you look at the mark as a whole, but that doesn't prevent you from looking at the individual elements as well to inform what the mark as a whole may communicate. Well, that's how the human mind works, but we're now looking at what the practical difference would be. Between, in the case of your... With or without the disclaimer. With or without the disclaimer. The practical evidence, I think, is just one of a slightly greater hurdle that the applicant would have in showing that New Hampshire Fish Fry Products infringes their mark. Slightly greater hurdle. Because of the disclaimer. And to the extent that I just mentioned, that only because that particular element of the mark had been disclaimed. That's interesting. On acquired distinctiveness, I'd simply like to emphasize that there are no surveys or consumer affidavits in the record here. That all of the affidavits and the amounts of advertising and the amount of sales that are behind them, as your Honor pointed out earlier, was not for Fish Fry Products alone. It was for marks that either include all of the elements that are behind them, that are in the mark that's at issue here, or at minimum, Louisiana Fish Fry. So they're off target. I would also... If they've been marketing the product as Louisiana Fish Fry Products, they've been doing this for a number of years, why would they have marketing data just on Fish Fry Products alone? I don't know. I can't explain why they would have marketing data on any specific permutation of that. I think what's clear here is that there's no evidence in the record at all that they've used Fish Fry Products alone. I think that's highly significant. All of their efforts were on Louisiana Fish Fry Products. And we, in several prior registrations, have allowed them, have accepted their 2F acquired distinctiveness evidence for the word Louisiana. So we think that that serves as an indicator of source in the context of their goods and services. 2F for Louisiana, 2F for the entire phrase, right? No, 2F for the word Louisiana in several of the prior registrations. Presuming a disclaimer? Yeah, there were, well, the disclaimers, there were all sorts of different permutations of the mark and the goods in the record, or registrations in the record. It can't be 2F for the word Louisiana unconnected with any product. No, that's exactly right. What I'm saying is in connection with the products that they have been selling, we have accepted, I believe, in more than one registration that Louisiana has acquired distinctiveness. And so my point is simply that... For Fish Fry Products. For the various products that they have, yes. Then there are lots and lots of different products in the record. Okay. And if there are no further questions? Thank you. Anyone have more questions? No. Okay. Thank you, Mr. Casagrande. Mr. Boyd. Thank you, Your Honor. I'd like to close with two points I'd like you to take away from this. First of all, there is a decision of the Board of Patent Appeals determining that Fish Fry Products is generic. And if that decision is allowed to stand because the board, this court rather, determines that we haven't met our burden on acquired distinctiveness, then we're going to have a decision holding Fish Fry Products to be generic. And I would submit that my client would be hard-pressed to ever be able to establish acquired distinctiveness in Fish Fry Products. Second... But that doesn't inhibit the registration of Louisiana Fish Fry Products with a disclaimer, does it? Certainly. If we disclaim Fish Fry Products, it's the registrational issue. But we have a decision of the board below saying that Fish Fry Products is generic. And that is an issue that I'm urging this court to address and reverse. Second, I want to leave you with this question. The way you can tell that there is no... They haven't met their burden of proof here. If you were to ask someone, please stop by the store and pick up some Fish Fry Products. And I submit to you, if you did that, you'd be sorely disappointed if you expected them to bring back spices, sauces, and marinades. And there's nothing in the record that would indicate that a request for Fish Fry Products is likely to yield a purchase of spices, sauces, and marinades. But that's a secondary meaning issue. You disagree that you have the burden of proof on that. It's not secondary meaning, Your Honor. What they have to prove to establish genericness is that the primary understanding of the relevant public is that Fish Fry Products refers to spices, sauces, and marinades. And there's nothing in the record that establishes that. And that's a generic decision. Who are you arguing is a relevant public here? General population, Your Honor. We sell this stuff not just to people who eat fish fry. We sell this to everyone, every grocery store. Thank you, Your Honor. I appreciate your time. I look forward to your decision. Thank you. Thank you both. The case is taken under submission.